1   David T. Biderman, Bar No. 101577
    DBiderman@perkinscoie.com
2   Judith B. Gitterman, Bar No. 115661
    JGitterman@perkinscoie.com
3   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
4   Los Angeles, CA 90067-1721
    Telephone: 310.788.9900
5   Facsimile: 310.788.3399

6   Floyd Abrams
    fabrams@cahill.com
7   Brian T. Markley
    bmarkley@cahill.com
8   CAHILL GORDON & REINDEL LLP
    80 Pine Street
9   New York, NY 10005
    Telephone: 212.701.3000
10  Facsimile: 212.269.5420
    (Admitted Pro Hac Vice)

11

    Attorneys for Standard & Poor's Financial Services
12  LLC, incorrectly sued as Standard & Poor's

13  *- Additional Counsel Listed on Signature Page -*

14
                    UNITED STATES DISTRICT COURT
15
                   CENTRAL DISTRICT OF CALIFORNIA
16
                         SOUTHERN DIVISION
17

18

19  PAUL RICE and JOSEPH RICE,        | Case No. SACV 10-00398 CJC (MLGx)

20              Plaintiffs,           | **THE RATING AGENCIES' JOINT
                                      | MEMORANDUM OF POINTS AND
21      v.                            | AUTHORITIES IN SUPPORT OF
                                      | THEIR MOTION TO DISMISS THE
22  CHARLES SCHWAB, MOODY'S           | SECOND AMENDED COMPLAINT**
    INVESTORS SERVICE, and
23  STANDARD & POOR'S,                | Date:        October 25, 2010
                                      | Time:        1:30 PM
24              Defendants.           | Place:       Courtroom 9(B)

25                                    | Hon. Cormac J. Carney

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................. 1

II.  STANDARD OF REVIEW .................................................. 4

III.  ARGUMENT ........................................................................ 5

    A.  Plaintiffs' Claim For Negligent Misrepresentation Must Be Dismissed Because The CRAs Did Not, As A Matter Of Law, Owe Plaintiffs Any Duty Of Care ............................ 5

        1.  Plaintiffs Fail to Plead a Duty of Care Under New York Law ................................................................. 5

        2.  Plaintiffs Alternatively Fail To Plead A Duty Of Care Under California Law ...................................... 8

    B.  Plaintiffs Have Failed To Allege Sufficiently The Additional Elements Necessary To State A Claim For Negligent Misrepresentation ..................................................... 10

    C.  Plaintiffs Have Failed To Allege With Particularity  The Elements Necessary To State A Claim For Intentional Misrepresentation ..................................................... 14

    D.  The Credit Rating Agency Reform Act Of 2006 Expressly Preempts Plaintiffs' Negligence And Negligent Misrepresentation Claims ................................................ 16

    E.  Plaintiffs' Negligence And Negligent Misrepresentation Claims Against The CRAs Must Be Dismissed For The Additional Reason That They Are Barred By The First Amendment to the United States Constitution ......................................... 20

        1.  Credit Ratings Are Opinions Entitled to Full First Amendment Protection ............................................ 21

        2.  Plaintiffs Have Not Alleged Actual Malice ............. 23

IV.  CONCLUSION ................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Page**

3    Cases

4    *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
     651 F. Supp. 2d 155 (S.D.N.Y. 2009) ..........................................22n, 23n

5    *Aetna Cas. and Sur. Co.* v. *Aniero Concrete Co.*,
     404 F.3d 566 (2d Cir. 2005)...................................................................... 11

6    *Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388 (9th Cir. 1988) .......... 4

7    *Anderson* v. *Deloitte & Touche LLP*,
     56 Cal. App. 4th 1468 (1st Dist. 1997)...................................... 14, 14n, 15

8    *Apollo Capital Fund, LLC* v. *Roth Capital Partners, LLC*,
     158 Cal. App. 4th 226 (2d Dist. 2007)................................................... 11
9

*Ashcroft* v. *Iqbal*,
10    129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) ..............................................4

11    *Barger* v. *Playboy Enterprises, Inc.*,
     564 F. Supp. 1151 (N.D. Cal. 1983) ...................................................... 25

12    *Bell Atlantic Corp.* v. *Twombly*,
     550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)...................... 16

13    *Bily* v. *Arthur Young & Co.*,
     3 Cal. 4th 370 (1992) .......................................................... 8, 10n, 13
14

*BMW of North America, Inc.* v. *Gore*,
15    517 U.S. 559, 116 S. Ct. 1589, 134 L.Ed.2d 809   (1996)................... 19

16    *Bose Corp.* v. *Consumer Union of United States, Inc.*,
     466 U.S. 485, 104 S. Ct. 1949, 80 L.Ed.2d 502 (1984).........................24

17    *California Public Employees' Retirement System* v. *Moody's Corp., et al.*,
     No.09-490214, 2010 WL 2286924 (Cal. Super. Ct. May 24, 2010) ........ 22n-23n

18    *Cisneros* v. *Alpine Ridge Group*,
     508 U.S. 10, 113 S. Ct. 1898, 123 L.Ed.2d 572 (1993)....................... 19
19

*City of Cleveland* v. *Ameriquest Mortgage Securities, Inc.*,
20    621 F. Supp. 2d 513 (N.D. Ohio 2009)................................................. 19n

21    *Compuware Corp.* v. *Moody's Investors Services, Inc.*,
     499 F.3d 520 (6th Cir. 2007)...........................................................21-22, 25

22    *County of Orange* v. *McGraw-Hill Cos.*,
     245 B.R. 151 (C.D. Cal. 1999) ..............................................................24

23    *Daniel* v. *Dow Jones & Co.*,
     137 Misc. 2d 94, 520 N.Y.S.2d 334 (N.Y.C. Civ. Ct. 1987).....................6
24

*Ebeid ex rel. U.S.* v. *Lungwitz*, 2010 WL 3092637  (9th Cir. Aug. 9, 2010) ....11, 13

25    *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
     511 F. Supp. 2d 742 (S.D. Tex. 2005).............................9-10, 23n, 24-25

26

27    *First Equity Corp. of Florida* v. *Standard & Poor's Corp.*, 689 F.2d 175 (2d Cir.
     1989) ....................................................................................... 7

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Gertz* v. *Robert Welch, Inc.*,
418 U.S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974) .......................................... 22

*In re Glenfed, Inc. Securities Litigation*,
42 F.3d 1541 (9th Cir. 1994), *superceded in part by statute* 15 U.S.C. §
78u-4(b)(2) (1995) ....................................................................................... 2-3, 11

*Glen Holly Entertainment, Inc.* v. *Tektronix, Inc.*,
100 F. Supp. 2d 1086 (C.D. Cal. 1999) ........................................... 10-11, 13

*Harte-Hanks Communications, Inc.* v. *Connaughton*,
491 U.S. 657, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989) ........................... 24-25

*Heftel* v. *General Motors Corp.*,
1988 WL 19615 (D.D.C. Feb. 23, 1988) ................................................... 19

*Hustler Magazine* v. *Falwell*,
485 U.S. 46, 108 S. Ct. 876, 99 L.Ed.2d 41 (1988) ................................... 23

*Hydro Investors, Inc.* v. *Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) ................................................................... 10, 10n

*In re IndyMac Mortgage Backed Securities Litigation*,
2010 WL 2473243 (S.D.N.Y. June 21, 2010) ............................................. 12

*Jaillet* v. *Cashman*,
115 Misc. 383, 189 N.Y.S. 743 (Sup. Ct. N.Y. Co. 1921),
*aff'd* 235 N.Y. 511, 139 N.E. 714 (1923) ............................................... 6-7

*Jefferson Co. Sch. Dist.* v. *Moody's Investors Svcs., Inc.*,
175 F.3d 848 (10th Cir. 1999) ....................................................... 22, 23n

*Kearney* v. *Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) ........................................................................... 5n

*In re Lehman Bros. Securities and ERISA Litigation*,
684 F. Supp. 2d 485 (S.D.N.Y. 2010) ................................................... 12

*Mendes* v. *Medtronic, Inc.*,
18 F.3d 13 (1st Cir. 1994) ................................................................... 19

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003),
*aff'd sub. nom. on other grounds Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ........................................................... 14-15

*Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003) ....... 4

*New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*,
2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ......................................... 12

*New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*,
2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................................... 12

*New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group,
PLC*,
2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ......................................... 12

*New York Times* v. *Sullivan*,
376 U.S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) ................................. 23

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3

*Paul Rice et al.* v. *Charles Schwab et al.*, No. 10-00398-CJC(MLGx)
(C.D. Cal. Aug. 4, 2010) ..................................................................1, 13n

4

*Ossining Union Free School District* v. *Anderson LaRocca Anderson*,
73 N.Y.2d 417, 539 N.E.2d 91 (1989) ................................................ 6

5

*In re Pan Am Corp.*,
161 B.R. 577 (S.D.N.Y. 1993) ........................................................21n

6

*Quinn* v. *McGraw-Hill Cos.*,
168 F.3d 331 (7th Cir. 1999) ..................................................... 14, 16n

7

*Reich* v. *Purcell*,
67 Cal. 2d 551 (1967) .....................................................................5n

8

*Rick-Mik Enterprises, Inc.* v. *Equilon Enterprises LLC*,
532 F.3d 963 (9th Cir. 2008) ............................................................ 4

9
10

*Riegel* v. *Medtronic, Inc.*,
552 U.S. 312, 128 S. Ct. 999, 169 L.Ed.2d 892 (2008) ...................19-20

11

*In re Salomon Analyst Level 3 Litig.*,
350 F. Supp. 2d 477 (S.D.N.Y. 2004) ............................................... 15

12

*San Diego Building Trades Council* v. *Garmon*,
359 U.S. 236, 79 S. Ct. 773, 3 L.Ed.2d 775 (1959) ........................... 19

13

*In re Scott Paper Co. Sec. Litig.*,
145 F.R.D. 366 (E.D. Pa. 1992) ......................................................21n

14
15

*Security Pacific Business Credit, Inc.* v. *Peat Marwick Main & Co.*,
79 N.Y.2d 695, 597 N.E.2d 1080 )1992) ............................................ 7

16

*Shamley* v. *ITT Corp.*,
869 F.2d 167 (2d Cir. 1989) ........................................................... 25

17

*St. Amant* v. *Thompson*,
390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968) .....................23-24

18
19

*Time, Inc.* v. *Hill*,
385 U.S. 374, 87 S. Ct. 534, 17 L.Ed.2d 456 (1967) ......................... 23

20

*Tsereteli* v. *Residential Asset Securitization Trust*,
*2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) ............................... 12

21

*Ultramares Corp.* v. *Touche*,
255 N.Y. 170, 174 N.E. 441 (1931) ..........................................5n, 6, 8

22

*Vanguard Mun. Bond Fund, Inc.* v. *Cantor, Fitzgerald L.P.*,
40 F. Supp. 2d 183 (S.D.N.Y. 1999) .............................................6-7

23
24

*Waggoner* v. *Snow, Becker, Kroll, Klaris & Krauss*,
991 F.2d 1501 (9th Cir. 1993) ........................................................5n

25

*Wynn* v. *AC Rochester*,
273 F.3d 153 (2d Cir. 2001) ..........................................................14n

26

*In re Wyse Technology Sec. Litig.*,
744 F. Supp. 207 (N.D. Cal. 1990) ................................................. 16

27
28

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

Constitutional Amendments

    U.S. Const. Amend. I ...................................................................21-23

Statutes

Securities and Exchange Act of 1934
    15 U.S.C. § 78c(a)(62) ...................................................... 17n

Credit Rating agency Reform Act of 2006 ("CRARA")
    15 U.S.C. § 78o-7(c)(1)-(2) ..............................................*passim*

Cal. Prob. Code § 16047(a) (Thomson Reuters 1995).........................16n

Rules

Fed. R. Civ. P. 9(b)...........................................................*passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................1

Other Authorities

Restatement (Second) of Torts (1977), § 552 ......................................8-9

Timothy M. Sullivan, Note, *Federal Preemption and The Rating Agencies:*
    *Eliminating State Law Liability to Promote Quality Ratings*, 94 Minn. L. Rev.
    2136, 2153 (June 2010) ..................................................... 18

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Defendants Standard & Poor's Financial Services, LLC ("S&P") and
2  Moody's Investors Service, Inc. ("Moody's") (together the "CRAs"), respectfully
3  submit this joint memorandum of law in support of their motion to dismiss,
4  pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), the Second Amended Complaint (the
5  "SAC") filed by plaintiffs Paul Rice and Joseph Rice (the "Plaintiffs").

6  ## I.    INTRODUCTION

7  On August 4, 2010, this Court dismissed Plaintiffs' First Amended
8  Complaint ("FAC") asserting claims for negligence, negligent misrepresentation
9  and intentional misrepresentation.  The Court identified several fatal errors in the
10  FAC, including that Plaintiffs failed to allege "why [the CRAs'] statements are
11  false" and otherwise failed to "allege[] their claims . . . with sufficient particularity"
12  as required by Federal Rule of Civil Procedure 9(b).  *See Paul Rice et al.* v. *Charles*
13  *Schwab et al.*, No. 10-00398-CJC(MLGx), slip op. at 2 n.1 (C.D. Cal. Aug. 4,
14  2010) ("August 4 Order"), at 2.  Although the Court granted Plaintiffs leave to
15  replead, it cautioned that "[i]f Plaintiffs choose to amend their complaint," they
16  must address the failings identified in the August 4 Order and "may wish to
17  consider some of the CRAs' other arguments as well." *Id.*[1]

18  Not surprisingly, Plaintiffs' SAC fails to cure the deficiencies identified in
19  the August 4 Order and does not (and cannot) fix any of the other fatal flaws
20  addressed in the CRAs' original motion to dismiss.  Remarkably, a close inspection
21  of Plaintiffs' SAC reveals that they have made only *two* substantive changes to
22  their allegations:  (i) they now include language asserting that the CRAs' ratings
23  were "directly communicated" by the CRAs to Plaintiffs (¶16), and (ii) they now

---

[1]  The basic facts alleged by Plaintiffs are set forth in the Court's August 4
24  Order and we will not belabor them here.  Put simply, Plaintiffs demand
25  compensation from the CRAs for their alleged losses in preferred stock
26  issued by Fannie Mae and Freddie Mac.  Plaintiffs claim they are entitled to
27  this extraordinary relief because, prior to investing, they purportedly
     reviewed and relied on the CRAs' opinions about the creditworthiness of
28  Fannie and Freddie.

1   purport to identify the dates on which Plaintiffs' obtained the respective CRAs'
2   credit ratings and Plaintiffs' location at the time they obtained those ratings.  *See*
3   SAC ¶ 29.  Neither of these new immaterial allegations begins to render the SAC
4   sufficient to state a claim.

5          The first new allegation – a bare attempt by Plaintiffs to allege a basis for
6   some sort of duty of care between themselves and the CRAs – is a red herring.
7   While Plaintiffs use the words "directly communicated," a plain reading of the
8   entirety of the SAC reveals that Plaintiffs can only allege, at most, that they
9   purportedly received reports from their broker that happened to contain the CRAs'
10  publicly available ratings.  Plaintiffs make no allegation of a single meeting, phone
11  call, letter or email to them from any of the CRAs.  Indeed, Plaintiffs admit that the
12  ratings that appeared in these reports had been "published" by the CRAs to the
13  public at large.  Moreover, direct communication, such as that which occurs in a
14  subscription agreement, is by itself insufficient as a matter of law, even if it did
15  occur.  Plaintiffs do not (and cannot) allege that the ratings at issue were provided
16  for their own benefit or the benefit of any particular broker or investor.  Thus,
17  Plaintiffs cannot demonstrate (as they must) that the CRAs' rating opinions
18  constituted any sort of personal investment advice, or that Plaintiffs had any
19  relationship – *or contact of any kind* – with either of the CRAs.  Without this,
20  Plaintiffs cannot possibly demonstrate the existence of a duty of care, the
21  fundamental legal prerequisite to stating any claim for negligent misrepresentation.

22         Plaintiffs' second new allegation – that they received the ratings of each
23  CRA at a specific time and place – also fails to rescue the SAC.  Although
24  Plaintiffs will contend that this allegation constitutes the "who," "what," "when"
25  and "where" of their claim, the allegation says nothing about the critical question
26  specifically identified by the Court in the August 4 Order: *i.e.*, "*why*" the CRAs'
27  alleged misstatements were false.  *See also In re Glenfed, Inc. Securities Litigation*,
28  42  F.3d  1541,  1547-48  (9th  Cir.  1994)  (requiring  plaintiffs  to  plead  the

1    "circumstances indicating falseness"), *superseded in part by statute*, 15 U.S.C §

2    78u-4 (b)2) (1995) (increasing the pleading standard).  Particularly here, where

3    Plaintiffs' purported claims arise out of non-actionable statements of opinion, they

4    cannot approach meeting this fundamental pleading standard.  Indeed, to meet their

5    burden, Plaintiffs would be required to plead particular facts to demonstrate that the

6    credit rating analysts responsible for the relevant CRA ratings had knowledge of the

7    alleged falsity of those ratings, *i.e.*, that the analysts actually *disbelieved* the ratings

8    for some particular reason.  It is now clear, after having had three chances to make

9    such allegations, that Plaintiffs simply cannot do so.

10          Putting aside their two new, inconsequential allegations, Plaintiffs

11    otherwise rely wholesale on the very allegations contained in their dismissed FAC

12    that led to the Court's prior order of dismissal.  Obviously, those allegations

13    provide no more basis on which to state a claim now than they did on August 4,

14    2010, when then FAC was dismissed.  Among other things, Plaintiffs continue to

15    allege (i) that the CRAs' ratings on Fannie Mae and Freddie Mac securities were

16    "misleading and omitted material facts" (*compare* FAC ¶18 *with* SAC ¶ 18), and

17    (ii) that the CRAs "had knowledge that Fannie Mae and Freddie Mac were in

18    financial trouble and were bad risks." (*Compare* FAC ¶ 18 *with* SAC ¶ 18).  As

19    demonstrated in the CRAs' earlier submission, and explained again below, such

20    conclusory allegations cannot constitute actionable misstatements by the CRAs,

21    particularly under the heightened standard imposed by Rule 9(b).  Nor do these

22    allegations, or additional allegations copied from Plaintiffs' earlier pleading, satisfy

23    the other elements necessary to state a claim for negligence, negligent

24    misrepresentation or fraud.

25          As explained below, Plaintiffs' SAC also cannot avoid the preemptive

26    effects of The Credit Rating Agency Reform Act of 2006 (the "CRARA"), 15

27    U.S.C. § 78o-7(c)(1)-(2) (2006).  Finally, Plaintiffs' negligent misrepresentation

28    claim continues to be barred by fundamental principles of constitutional law, both

1  because credit ratings are, by their nature, non-actionable expressions of opinion

2  and because Plaintiffs fail to allege that the CRAs acted with actual malice.

3      For all these reasons, Plaintiffs claims should be dismissed, this time with

4  prejudice.

5  ## II.    STANDARD OF REVIEW

6      As explained in the CRAs' original motion to dismiss,

7  "threadbare recitals of the elements of a cause of action, supported by mere

8  conclusory statements, do not suffice" to survive a motion to dismiss. *Ashcroft* v.

9  *Iqbal*, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted). *See also*

10 *Rick-Mik Enterprises, Inc.* v. *Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir.

11 2008) ("'[A] formulaic recitation of the elements of a cause of action will not do.'")

12 (citation omitted).  Instead, a plaintiff must plead "factual content [that] allows the

13 court to draw the reasonable inference that the defendant is liable for the

14 misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  As the Court in this case has

15 recognized, the standard is even higher with respect to claims alleging negligent

16 misrepresentation and fraud, which require *particularized* allegations including "the

17 time, place and content" of each allegedly deceitful statement.  August 4 Order at 2

18 (citing *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal.

19 2003).  As the Court further recognized, Plaintiffs here have the burden to "state the

20 time, place and specific content of the [allegedly] false representations[.]" *Alan*

21 *Neuman Productions, Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988).

22     Applying these standards, it is again plain, for the reasons detailed below,

23 that Plaintiffs are unable as a matter of law to state a claim against the CRAs.

24

25

26

27

28

# III.   ARGUMENT

**A.   Plaintiffs' Claim For Negligent Misrepresentation Must Be Dismissed Because The CRAs Did Not, As A Matter Of Law, Owe Plaintiffs Any Duty Of Care**

Plaintiffs' claim for negligent misrepresentation[2] must be dismissed because Plaintiffs still fail to make any allegation that they stood in privity or its functional equivalent with the CRAs (as required under New York law), or that they were otherwise members of a "limited group of intended beneficiaries" of the CRAs' credit ratings (as required under California law).[3]

**1.   Plaintiffs Fail to Plead a Duty of Care Under New York Law**

As demonstrated in the CRAs' original motion, New York case law has long provided that liability for negligent misrepresentation can exist only where

---

[2]   Although Plaintiffs purport to make separate claims for negligence and negligent misrepresentation, this Court previously made clear that "Plaintiffs' claim for 'negligence' is actually a claim for negligent misrepresentation because it alleges that Plaintiffs relied on Defendants' false statements." August 4 Order.   This finding is completely ignored in Plaintiffs' SAC, which simply repeats both causes of action as if they were distinct.

[3]   The "governmental interest" approach applied by California to choice of law questions focuses on the "interests of the litigants and the involved states." *Reich* v. *Purcell*, 67 Cal. 2d 551, 553 (1967).   The driving consideration is the "appropriate scope" and not the "quality" of the "conflicting state policies."   *Kearney* v. *Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 112 (2006).   The "mere fact that California laws are more favorable to [plaintiff]'s claim . . . cannot make California law controlling." *Waggoner* v. *Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1507-08 (9th Cir. 1993).

These principles support the application of New York law to Plaintiffs' negligent misrepresentation claim.   Both S&P and Moody's formed and published their credit rating opinions from their corporate headquarters in New York.   *See* Exhibits 1 and 2, respectively to the September 13, 2010 Declaration of David T. Biderman in Support of the Joint Motion to Dismiss (the "Biderman Decl.") and the September 13, 2010 Declaration of Joshua M. Rubins (the "Rubins Decl.").   Additionally, New York, as a global financial center, has a long history of promoting the broad dissemination of information to the marketplace and protecting that goal through the requirement that a special relationship be established before liability will attach for allegedly negligent statements. *See Ultramares Corp.* v. *Touche*, 255 N.Y. 170, 182-83, 174 N.E. 441, 446 (1931).

---

1    there is privity or a "bond . . . so close as to approach that of privity" between the

2    plaintiff and the defendant.  *See Ultramares*, 255 N.Y. at 182-83.  Here, Plaintiffs

3    have not alleged, and obviously cannot allege, actual privity with the CRAs.  Nor

4    can they allege the alternative near-privity, which has been defined as: "(i)

5    awareness that the [allegedly negligent representations] were to be used for a

6    particular purpose or purposes; (ii) reliance by a known party or parties in

7    furtherance of that purpose; and (iii) some conduct by the defendants linking them

8    to the party or parties and evincing defendant's understanding of their reliance."

9    *Ossining Union Free School District* v. *Anderson LaRocca Anderson*, 73 N.Y.2d

10   417, 425, 539 N.E.2d 91, 95 (1989) (citation omitted).

11           It is well-established that a contrary rule, allowing plaintiffs to state a

12   claim for negligent misrepresentation absent privity or its functional equivalent,

13   would expose the speaker to the unacceptable prospect of "liability in an

14   indeterminate amount for an indeterminate time to an indeterminate class."

15   *Ultramares*, 255 N.Y. at 179.   As explained in the CRAs' earlier submission,

16   seminal cases such as *Jaillet* v. *Cashman*, 115 Misc. 383, 384, 189 N.Y.S. 743, 744

17   (Sup. Ct. N.Y. Co. 1921), *aff'd* 235 N.Y. 511, 139 N.E. 714 (1923), long ago

18   recognized that an investor who relies to his detriment on incorrect information that

19   is broadly disseminated (*e.g.,* over a news ticker service as in *Jaillet*) cannot state a

20   claim because he is "but one of a public to whom all news is liable to be

21   disseminated."   Any other standard, the court held, would make the defendant

22   potentially liable "to every member of the community who was misled by the

23   incorrect report."   *See also Daniel* v. *Dow Jones & Co*., 137 Misc. 2d 94, 96-97,

24   520 N.Y.S.2d 334, 336 (N.Y.C. Civ. Ct. 1987).   New York courts have consistently

25   adhered to the rule of *Ultramares* and *Jaillet*, dismissing claims where the plaintiff

26   and defendant were not in privity or its functional equivalent.   *See, e.g., Vanguard*

27   *Mun. Bond Fund, Inc.* v. *Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 189-95

28

(S.D.N.Y. 1999); *Security Pacific Business Credit, Inc.* v. *Peat Marwick Main & Co.*, 79 N.Y.2d 695, 704-08, 597 N.E.2d 1080, 1084-87 (1992).

Here, the SAC still lacks *any* allegations to suggest that there was a relationship, or even a casual interaction, between either of the CRAs and either of the Plaintiffs.  Instead, the SAC merely alleges, in misleading fashion, that the CRAs "directly communicated [their] published ratings to the Plaintiffs."  SAC ¶ 16.  This threadbare allegation is plainly inadequate to satisfy the near-privity standard.  Indeed, the SAC itself goes on to clarify that this allegation of "direct" communication means only that the ratings were included in a Fixed Income Offering Report provided to Plaintiffs by their broker (SAC ¶¶ 8, 10, 12, 14).  Plaintiffs further admit (as they must) that the CRAs "published" these ratings to the market at large.  *See e.g.,* SAC ¶ 17-19.  Regardless of whether Plaintiffs were among the recipients of these broadly published ratings, or whether the ratings also ended up in a report provided to Plaintiffs by their broker, no such allegations can constitute the sort of relationship or communications that could satisfy the near-privity standard under New York law.  *First Equity Corp. of Florida* v. *Standard & Poor's Corp.*, 689 F.2d 175, 179 (2d Cir. 1989) (affirming application of *Jaillet* to a case brought against S&P and making clear that even a subscription agreement would not place a plaintiff in privity).  Again, Plaintiffs fail to allege anything that would distinguish themselves from any of the hundreds of thousands of investors around the world who may have considered the CRAs' widely available rating opinions.  *See, e.g.,* SAC ¶ 17.[4]

Nor can Plaintiffs allege (as they must) that (i) the CRAs published their Fannie Mae and Freddie Mac ratings for the "particular purpose" of inducing Plaintiffs' reliance; (ii) the CRAs "specifically agreed" to prepare their ratings for

---

[4]    Plaintiffs continue to confuse the ratings scale employed by each of the CRAs as demonstrated in the ratings reports, attached as Exhibits 1 and 2, respectively to the Biderman Decl. and the Rubins Decl.

Joint Memorandum of Points and Authorities in
Support of Motion to Dismiss

Plaintiffs' intended use; or (iii) the CRAs had "specifically agreed" to provide them with a copy of the ratings. *Ultramares*, 255 N.Y. at 553. To the contrary, Plaintiffs continue to acknowledge (as they must) that these ratings, which addressed the creditworthiness of publicly traded securities issued by large, well-known government sponsored entities ("GSEs"), were made available to the vast investing public. Plaintiffs do not (and cannot) make any allegation that the ratings were intended for their own specific use, or the use of any other particular investor. Plaintiffs thus cannot allege a duty of care under New York law, and their claim for negligent misrepresentation must fail.

### 2.    Plaintiffs Alternatively Fail To Plead A Duty Of Care Under California Law

Plaintiffs' SAC similarly fails to allege the existence of a duty of care under the law of California, which follows Section 552 of the Restatement (Second) of Torts (1977). *See Bily* v. *Arthur Young & Co*., 3 Cal. 4th 370, 407-15 (1992) (recognizing that liability for negligent misrepresentation "is limited to loss suffered . . . by the person or one of a limited group of persons for whose benefit and guidance" information is provided). Similar to the *Ultramares* rule, the "limited group" requirement is designed to "promote[] the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests." *See* Restatement § 552 cmt a. The California Supreme Court held in *Bily* that Section 552 limits liability for negligent misrepresentation to instances where information is transferred "with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction, that defendant intended to influence." 3 Cal. 4th at 414 (citation and internal quotation marks omitted). Here, as noted above, Plaintiffs still fail to allege any facts upon which to infer that they were a member of any limited group of intended beneficiaries of the CRAs' ratings, or that the CRAs intended to induce their reliance in any transaction.

1         One instructive case on this point is *In re Enron Corp. Securities,*

2    *Derivative & "ERISA" Litigation*, 511 F. Supp. 2d 742, 808-27 (S.D. Tex. 2005),

3    in which the court overseeing the multidistrict *Enron* litigation dismissed negligent

4    misrepresentation claims against S&P.  The plaintiff in *Enron*, similar to Plaintiffs

5    here, alleged that the CRAs "failed to exercise reasonable care or competence in

6    obtaining and communicating accurate information concerning the creditworthiness

7    of Enron" and that they published "false and misleading credit information"

8    concerning the company.  *Id*. at 808-09.   Applying Connecticut law, which is

9    similar to Section 552, the court found that the CRAs owed no duty of care because

10   the plaintiff failed to allege any contact in connection with its transaction with

11   Enron, and was thus no different than any of the countless investors, counterparties

12   and others who might have consulted ratings on Enron.  *Id*. at 826-27.

13        This Court has previously discussed the significant r[o]le played by the

14        Credit Rating Agencies in the efficient operation of capital markets,

15        which would be chilled by unlimited liability for creditworthiness

16        ratings, while public policy clearly encourages "continued vigorous

17        participation in the activity."  . . . [A]llowing anyone to sue credit

18        rating agencies who had read the credit rating reports and claimed to

19        have relied upon them and lost money in any endeavor that person

20        undertook would be far more deleterious than beneficial to society as a

21        whole.

22   *Id*. at 827 (citation omitted).  The *Enron* court also recognized the serious chilling

23   effect that would result if any of the countless potential plaintiffs who might claim

24   to have relied on defendants' credit ratings could state a claim for negligent

25   misrepresentation:

26        To vigorously participate in the credit rating industry, which provides

27        useful information for investors, Rating Agencies must be allowed to

28        maintain independence and objectivity and not be swayed by risk of

1   unlimited liability for errors to either issuers or investors; instead the
2   market should be the appropriate means for ensuring the reliability of
3   credit opinions and of rating agencies.

4   *Id*. at 815.

5   Finding that no duty of care existed – or could have existed – between plaintiff and
6   the rating agencies, the court dismissed the plaintiff's claim with prejudice.  *Id*. at
7   827.

8          The same continues to be true here, where Plaintiffs simply cannot allege
9   that they had any contact with the CRAs that would differentiate them even slightly
10  from the world of other prospective investors with access to the CRAs' broadly
11  disseminated opinions about Fannie Mae and Freddie Mac.   *See* SAC ¶ 17
12  (acknowledging that Moody's and S&P both "published" their ratings to the
13  public).   For this reason, Plaintiffs negligent misrepresentation claim must fail
14  under both New York and California law.

15  **B.   Plaintiffs Have Failed To Allege Sufficiently The Additional Elements
       Necessary To State A Claim For Negligent Misrepresentation**
16
17         A claim for negligent misrepresentation under both New York and
18  California law also requires a plaintiff to allege that (i) "the defendant made a false
19  representation that he or she should have known was incorrect;" (ii) "the
20  information supplied in the representation was known by the defendant to be
21  desired by the plaintiff for a serious purpose;" (iii) "the plaintiff intended to rely
22  and act upon it; and" (iv) "the plaintiff reasonably relied on it to his or her
23  detriment."  *Hydro Investors, Inc.* v. *Trafalgar Power Inc*., 227 F.3d 8, 20 (2d Cir.
24  2000).[5]  Similar to Plaintiffs' two prior pleadings, the SAC again fails to allege
25  these necessary elements under any standard, much less the heightened standard
26  that applies under Rule 9(b).  *See Glen Holly Entertainment, Inc.* v. *Tektronix, Inc*.,

27  ───────────────
    [5]    These remaining elements are essentially the same under the laws of New
28         York and California.  *Compare Hydro Investors, Inc.*, 227 F.3d at 20, *with
           Bily*, 3 Cal. 4th at 407.

1    100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999); *Aetna Cas. and Sur. Co.* v. *Aniero*
2    *Concrete Co.*, 404 F.3d 566, 578-84 (2d Cir. 2005).

3          As a threshold matter, the SAC includes no new allegations to satisfy the
4    first critical element to state a claim for negligent misrepresentation – a knowing
5    misstatement.   As noted, Plaintiffs' SAC reflects only cosmetic revisions to the
6    dismissed FAC, including a new allegation that "Defendant [S&P] represented to
7    Plaintiffs that Fannie Mae with a dividend rate of 8.25 percent rated AA3" [sic] and
8    that "[t]hese representations, and every other representation referred to in this
9    Second Amended Complaint were made to the Plaintiffs in California."  While this
10   allegation purports to identify the CRAs by name, as well as the ratings at issue and
11   the place of the alleged misrepresentations, nowhere does the SAC address – as it
12   must to state a claim – "how" or "why" the CRAs' ratings were false.

13         The law is clear that to state a claim, Plaintiffs are required to set forth the
14   circumstances underlying the alleged misrepresentation, including not only "the
15   time, place and content" of each statement, but also the "circumstances indicating
16   falseness."   *In re Glenfed*, 42 F.3d at 1547-48; *see also Ebeid ex rel. U.S.* v.
17   *Lungwitz*, 2010 WL 3092637, at *4 (9th Cir. August 9, 2010).  As explained in the
18   CRAs' original memorandum, this would require in this case, among other things,
19   specific allegations to demonstrate that the rating analysts responsible for the
20   CRAs' ratings of Fannie Mae and Freddie Mac did not *genuinely believe* in those
21   specific rating opinions.  *See Apollo Capital Fund, LLC* v. *Roth Capital Partners,*
22   *LLC*, 158 Cal. App. 4th 226, 243 (2d Dist. 2007) (recognizing that negligent
23   misrepresentation must be a "misrepresentation of a past or existing material fact . .
24   . without reasonable ground for believing it to be true").

25         This principle has been recognized repeatedly in a series of recent cases
26   involving the CRAs, each holding that in order for a credit rating opinion to
27   constitute an actionable false statement, a plaintiff must allege that the CRA
28   analysts responsible for that rating opinions did not truly hold the views expressed.

For example, in a recent decision dismissing claims brought against the same CRAs, the court in the *In re Lehman Bros.* litigation held that for credit rating opinions to be actionable, "*the complaint must allege that the ratings agencies did not truly hold those opinions at the time they were made public*." *In re Lehman Bros. Securities and ERISA Litigation*, 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010) (emphasis added). Similarly, in *In re IndyMac Mortgage Backed Securities Litigation*, 2010 WL 2473243, at *11 (S.D.N.Y. June 21, 2010), another securities fraud case decided recently, the court recognized that "[r]atings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued." And in *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, 2010 WL 1172694, at *14 (S.D.N.Y. Mar. 26, 2010), the court held that "credit ratings . . . are statements of opinion, as they are predictions of future value and future protection of that value. . . . *Plaintiffs can only demonstrate an actionable misstatement if 'the opinion is both (1) not believed by the speaker and (2) objectively untrue.'*" (emphasis added) (citation omitted). *See also Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 394-95 (S.D.N.Y. 2010); *New Jersey Carpenters Health Fund* v. *DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010); *New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010).

Nor can Plaintiffs state a claim by simply repeating conclusory allegations contained in their dismissed FAC, *e.g.,* that S&P's and Moody's ratings of Fannie Mae and Freddie Mac were "misleading and omitted material facts" (SAC ¶ 18) and that the CRAs "had knowledge that Fannie Mae and Freddie Mac were in financial trouble and were bad risks." *Id*. As noted, these exact allegations failed previously and they must fail now for the same reasons. Put simply, they are far too conclusory and do not constitute the sort of particularized allegation required to

1    state a claim for negligent misrepresentation under California law and Rule 9(b).[6]

2    *See Ebeid ex rel. U.S.*, 2010 WL 3092637, at *4; *Glen Holly Entertainment, Inc.*,

3    100 F. Supp. 2d at 1093.

4         The SAC is also still devoid of any requisite allegation that S&P and

5    Moody's knew these particular Plaintiffs would use their ratings on Fannie Mae and

6    Freddie Mac bonds for any particular purpose.  This, too, compels dismissal as a

7    matter of law.  *See Bily*, 3 Cal. 4th at 414-15.  Nor can Plaintiffs as a legal matter

8    allege that their purported reliance on the CRAs' credit ratings was reasonable, as

9    required to satisfy the third element of a negligent misrepresentation claim.  That is

10   because the CRAs' respective credit rating reports contained express cautionary

11   language about the nature of their rating opinions and their proper use.

12        The credit ratings and observations contained herein are solely

13        statements of opinion and not statements of fact or recommendations

14        to purchase, hold, or sell any securities or make any other investment

15        decisions.  Accordingly, any user of the information contained herein

16        should not rely on any credit rating or other opinion contained herein

17        in making any investment decision.

18   *See* Biderman Decl., Ex. 1 and 2; *see also* Rubins Decl. Ex. 1 and 2.  As explained

19   in the CRAs' original memorandum, this sort of clear and unambiguous disclaimer

20   provides an independent ground for dismissal of Plaintiffs' claims as a matter of

21   _____

22   [6]   Plaintiffs also copied various allegations from their prior pleading (*compare*
           FAC ¶¶ 29-30, *with* SAC ¶¶30-31, 38-39) that are parroted from a July 2008
23         SEC Report that dealt exclusively with the CRAs' ratings of structured
           finance securities, and which the Court has already found to be insufficiently
24         particularized as a matter of law.  *See* August 4 Order at 2.  These allegations
           have no bearing on the alleged falsity of the ratings here – Fannie Mae and
25         Freddie Mac preferred shares are not structured finance securities and the
           SEC Report is unrelated to them.  Nor do Plaintiffs identify the respective
26         roles played by S&P and Moody's, instead continuing to lump them together
           as if they were a single actor despite the Court's explicit ruling that such
27         lumping together is impermissible as a matter of law.  August 4 Order, at 2.
           *See also, e.g.,* SAC ¶ 18; ¶¶ 30, 31.
28

1   law.  *See Quinn* v. *McGraw-Hill Cos.*, 168 F.3d 331, 336 (7th Cir. 1999) (affirming

2   dismissal of a misrepresentation claim against S&P on grounds that the investor

3   "was responsible for doing his own homework about the risks he was assuming"

4   and was on notice that an S&P rating was "not a recommendation to buy, sell, or

5   hold" a security).

6       Because Plaintiffs have failed to plead any of these necessary elements —

7   and certainly failed to do so with the requisite particularity — their claim for

8   negligent misrepresentation must be dismissed.

9   **C.   Plaintiffs Have Failed To Allege With Particularity  The Elements**
    **Necessary To State A Claim For Intentional Misrepresentation**

10

11      Plaintiffs also have not pled — and cannot sufficiently plead — any of the

12  elements necessary to state a claim for intentional misrepresentation under New

13  York or California law.  *See Anderson* v. *Deloitte & Touche LLP*, 56 Cal. App. 4th

14  1468, 1474 (1st Dist. 1997) (requiring plaintiff to allege "(i) misrepresentation

15  (false representation, concealment, or nondisclosure); (ii) knowledge of falsity

16  (scienter); (iii) intent to defraud (i.e., to induce reliance); (iv) justifiable reliance;

17  and (v) resulting damage").[7]

18      First, as demonstrated above, Plaintiffs do not allege any knowingly false

19  statement that could give rise to a fraud claim against the CRAs.  *See* 10-13, 13 n.6,

20  *supra*.  Courts have repeatedly dismissed fraud claims in cases, such as the present,

21  where a plaintiff fails to allege that the defendant held a subjective belief that its

22  stated opinion was unsupportable.   One such case, *In re Merrill Lynch & Co.*, 273

23  F. Supp. 2d 351, 368-75 (S.D.N.Y. 2003), *aff'd sub. nom. on other grounds Lentell*

24  v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), is particularly instructive.  In

25  _____

26  [7]   We cite to California law in this section because, unlike the law regarding negligent misrepresentation, there is no substantive difference between the laws of New York and California with respect to intentional misrepresentation.  *Compare Anderson*, 56 Cal. App. 4th at 1474, *with Wynn* v. *AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

27

28

1   *Merrill*, the court dismissed claims brought by investors who claimed to have relied

2   to their detriment on certain equity research reports issued by Merrill Lynch.  The

3   court dismissed the claims because plaintiff failed to allege that the equity ratings

4   were inconsistent with opinions truly held by defendant's analyst:

5           Nowhere in [the complaints] is it specifically alleged precisely *which*

6           analysts had *which* conflicts of interest involving *which* investment

7           banking deals leading to *which* . . . research reports being misleading,

8           to what degree, and when.  (emphasis in original).

9                                            * * *

10          Plaintiffs . . . must allege particular facts, *for each and every rating*

11          *challenged* [and] that Merrill Lynch and [its analyst] did not hold the

12          opinion or had no reasonable basis for believing the opinion. . . .

13          Allegations regarding the motivation to attract investment banking

14          business are not specific contemporaneous data or information

15          inconsistent with the opinions.

16  *Id.* at 371-73.  *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489

17  (S.D.N.Y. 2004) (Lynch, J.) (finding that opinions are actionable as misstatements

18  only if the plaintiff can "demonstrate that the statement of opinion is both

19  objectively and subjectively false.  It is not sufficient for these purposes to allege

20  that an opinion was unreasonable, irrational, excessively optimistic, not borne out

21  by subsequent events, or any other characterization that relies on hindsight or falls

22  short of an identifiable gap between the opinion publicly expressed and the opinion

23  truly held") (citations and internal quotation marks omitted); *see also supra* at 11-

24  12 (citing the recent series of cases addressing the non-actionability of credit rating

25  opinions); *Anderson*, 56 Cal. App. 4th at 1474.

26          Again, it is not sufficient for Plaintiffs merely to repeat an allegation

27  contained in their dismissed FAC that S&P's and Moody's ratings of Fannie Mae

28

and Freddie Mac were "misleading and omitted material facts." SAC ¶ 18. Nor is it sufficient for Plaintiffs to allege broadly without factual support that the CRAs "had knowledge that Fannie Mae and Freddie Mac were in financial trouble and were bad risks." *Id*. Plaintiffs are required instead to allege "*factual content*" to support an allegation that each of the CRAs did not believe in each of the ratings at issue. *See Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965-66, 167 L.Ed.2d 929 (2007). *See also In re Wyse Technology Sec. Litig.*, 744 F. Supp. 207, 208 (N.D. Cal. 1990). Because Plaintiffs have not pled – and in good faith cannot plead — sufficient facts to establish an entitlement to relief, their intentional misrepresentation claim must be dismissed with prejudice.[8]

**D.     The Credit Rating Agency Reform Act Of 2006 Expressly Preempts Plaintiffs' Negligence And Negligent Misrepresentation Claims**

Plaintiffs' claims for negligence and negligent misrepresentation are also preempted by the CRARA, which is the federal regulatory regime for rating agencies such as S&P and Moody's. In relevant part, the CRARA provides:

The [SEC] shall have *exclusive authority* to enforce the provisions of this section in accordance with this chapter with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest . . . . Notwithstanding any other

---

[8]     Nor can Plaintiffs satisfy the other elements of their putative fraud claim, *i.e.,* there is no allegation that S&P or Moody's had any intent to induce Plaintiffs' reliance on their ratings and, in any event, any such reliance would have been unreasonable in light of the clear disclaimers present in each of the CRAs' published reports. *See supra* at 13; *Quinn,* 168 F.3d at 336. Additionally, Plaintiff Paul Rice's exclusive reliance on the credit ratings was *per se* unjustifiable based the Uniform Prudent Investor Act, which is followed in California and provides, *inter alia,* that trustees "shall exercise reasonable care, skill, and caution" in satisfying the trustee's obligation to act as a "prudent investor." Cal. Prob. Code § 16047(a).

provision of law, neither the [SEC] nor any State (or political subdivision thereof) may regulate the *substance* of credit ratings or the *procedures and methodologies* by which any [NRSRO] determines credit ratings.

15 U.S.C. § 78o-7(c)(1) - (2) (emphases added).[9]  The first clause in this provision makes clear that the SEC has "exclusive" regulatory authority where an NRSRO is alleged to have issued ratings in "material contravention" of its procedures.  This provision helps ensure that NRSROs will not be subject to competing authorities, but rather the centralized oversight of the SEC.  The second clause provides that "notwithstanding" any other law, the substance of ratings and the methodologies used to generate them are not matters for any external regulation.  Thus, while the SEC – and the SEC alone – is responsible for regulating an NRSRO's adherence to its own procedures, *even the SEC* is not empowered to regulate the substance of those procedures or an NRSRO's credit ratings.  This balancing reflects Congress' recognition of the national importance of credit ratings and the vital need to protect the ability of the CRAs to make their best independent analytical judgment free of concern about later second-guessing if events turn out differently than they anticipated when they issued their opinions.

This interpretation of CRARA is consistent with Congress' goal of ensuring independently derived ratings while at the same time preventing fraudulent conduct on the part of the credit rating agencies.  In striking a balance that precludes private rights of action against the CRAs, Congress made clear that governmental enforcement actions remained a viable regulatory tool to prevent intentionally fraudulent or deceitful conduct.  *See* 15 U.S.C. § 78o-7(o)(2) ("Nothing in this subsection prohibits the securities commission . . . of any State

---

[9]     The term "nationally recognized statistical rating organization" ("NRSRO") refers to those rating agencies that: (i) are registered with the SEC; and (ii) otherwise satisfy the requirements set forth at 15 U.S.C. § 78c(a)(62).

from investigating and bringing an enforcement action with respect to fraud or deceit against any nationally recognized statistical organization.").  A recent law review article on the preemptive effect of CRARA makes just that point, concluding that "[b]oth Supreme Court jurisprudence and the ordinary meaning of 'regulate' point toward construing that word to include private causes of action in the context of a preemption clause."   Timothy M. Sullivan, Note, *Federal Preemption and The Rating Agencies: Eliminating State Law Liability to Promote Quality Ratings*, 94 Minn. L. Rev. 2136, 2153 (June 2010).  The article concludes, after detailed analysis of the CRARA language and relevant cases, that it was likely that "Congress intended to preempt all claims against rating agencies registered as NRSROs except enforcement actions brought by regulatory agencies on theories of rating agency fraud or deceit."  *Id.* at 2156.  Such preemption, the article explains, reflects the Congressional goal of improving ratings quality in part by promoting uniformity across jurisdictions.

Here, Plaintiffs base their claims against the CRAs on allegations that, for example, the ratings: (i) "were not substantiated by the known facts"; (ii) communicated "that Fannie Mae and Freddie Mac preferred stock [had been] . . . rated on the basis of current, accurate and complete data and analysis using reasonable and true models" and "had been rated by objective, independent third parties whose impartiality was not impaired by significant conflicts of interest"; (iii) "were false because the models, data and assumptions used to rate Fannie Mae and Freddie Mac were unreasonable, false, and based on pure speculation"; and (iv) were based on "eased [ ] credit-rating methods, [and] inaccurate and stale information" resulting from the CRAs' alleged attempts to compete with rival credit rating agencies.  *See, e.g.*, SAC ¶¶ 25, 30, 31.  These allegations make clear that Plaintiffs seek to engage in the very sort of after-the-fact second-guessing of analytical substance, procedures and methodologies that Congress prohibited by this express preemption provision.

1       Courts — including the United States Supreme Court — have repeatedly

2   interpreted language such as that contained within the CRARA as constituting an

3   explicit announcement of Congress' preemptive intent.   *See Cisneros* v. *Alpine*

4   *Ridge Group*, 508 U.S. 10, 18, 113 S. Ct. 1898, 1903, 123 L.Ed.2d 572 (1993) ("As

5   we have noted previously in construing statutes, the use of such a 'notwithstanding'

6   clause   clearly   signals   the   drafter's   intention   that   the   provisions   of   the

7   'notwithstanding' section override conflicting provisions of any other section.")

8   (citations omitted).   This language includes an intent to preempt civil claims

9   brought by private litigants.   *See, e.g., San Diego Building Trades Council* v.

10  *Garmon*,   359   U.S.   236,   247,   79   S.   Ct.   773,   780,   3   L.Ed.2d   775   (1959)

11  ("[R]egulation   can   be   as   effectively   exerted   through   an   award   of   damages   as

12  through some form of preventive relief.   The obligation to pay compensation can

13  be, indeed is designed to be, a potent method of governing conduct and controlling

14  policy."); *Mendes* v. *Medtronic, Inc.*, 18 F.3d 13, 18 (1st Cir. 1994); *Heftel* v.

15  *General Motors Corp.*, 1988 WL 19615, at *2 (D.D.C. Feb. 23, 1988); *cf. BMW of*

16  *North America, Inc.* v. *Gore*, 517 U.S. 559, 572 n.17, 116 S. Ct. 1589, 1598 n. 17,

17  134 L.Ed.2d 809 (1996).[10]

18      The Supreme Court has addressed the preemption of state claims recently

19  in an analogous case.   *See Riegel* v. *Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999,

20  169 L.Ed.2d 892 (2008).   In *Riegel*, the Court considered a provision of the Medical

21  Devices Act ("MDA"), which provides in relevant part that "'no State or political

22  subdivision of a State may establish or continue in effect . . . *any requirement*'"

23  regarding the safety or effectiveness of medical devices, if such requirement is

24  different from, or in addition to, any requirement under Federal law.   552 U.S. at

25  ────────────────────

[10]       *See also City of Cleveland* v. *Ameriquest Mortgage Securities, Inc.*, 621 F.

26      Supp. 2d 513, 518 (N.D. Ohio 2009) ("Without question, common law
        actions for damages represent an important manner of regulating conduct . . .

27      [and] the judicial process can be viewed as an extension of a government's

28      regulatory power.").

1    316 (citation omitted) (emphasis added).   The Court found that this language

2    preempted all "common-law claims challenging the safety and effectiveness of a

3    medical device given pre-market approval by the [FDA] . . . ." *Id*. at 312, 315.   In

4    finding that the MDA's preemption provision reached common-law claims, the

5    Court explained that "[a]bsent other indication, reference to a State's

6    '*requirements*' includes its common-law duties . . . ." *Id*. at 324 (emphasis added).

7    Even more broadly than the language at issue in *Riegel*, the language of the

8    CRARA is worded so as to preempt all forms of regulation — including common-

9    law liability.   Indeed, given Congress' clear intent to preclude both the SEC — the

10   NRSROs' exclusive regulator — and the States from regulating the substance of an

11   NRSRO's credit ratings or rating methodologies, it would be a strange result to

12   permit juries across the country who are not experts in this complicated area to

13   develop and enforce varying standards for ratings methodologies through the

14   imposition of common-law liability, while the SEC — an agency with specific

15   expertise and "exclusive authority" to oversee NRSROs — is prevented from doing

16   the same. *See Riegel*, 552 U.S. at 324; 15 U.S.C. § 78o-7(c)(1).

17          Here, Congress has struck the balance in the public interest between the

18   need for oversight and the need to preserve the independence of the CRAs'

19   opinions.   Plaintiffs' negligence and negligent misrepresentation claims are thus

20   preempted by Federal law, which requires dismissal with prejudice.

21   **E.    Plaintiffs' Negligence And Negligent Misrepresentation Claims Against**
         **The CRAs Must Be Dismissed For The Additional Reason That They**
22       **Are Barred By The First Amendment to the United States Constitution**

23          Plaintiffs' negligence and negligent misrepresentation claims must be

24   dismissed on the additional ground that they are barred by fundamental principles

25   of constitutional law.   Courts have repeatedly held that because the credit ratings

26   published by S&P and Moody's are, by their nature, predictive opinions on matters

27   of public concern, they are entitled to receive full constitutional protection under

28   the First Amendment to the United States Constitution.   Alternatively, courts have

also found that credit ratings are entitled to protection under the actual malice standard arising under the First Amendment, *i.e.*, S&P and Moody's are entitled to the same constitutional protections as other providers of financial information of public interest and, as such, cannot be liable for their published statements absent proof they made the statements with "knowledge of falsity or reckless disregard for the truth."[11]

### 1.   Credit Ratings Are Opinions Entitled to Full First Amendment Protection

As noted, it is well-established that credit ratings are "opinions" that inherently are not capable of being proven true or false. *See supra*, at 11-12 (five recently decided cases in which this point was emphatically reaffirmed).

The United States Court of Appeals for the Sixth Circuit agreed with this position when it observed in *Compuware*:

> A Moody's [credit] rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors.  We find no basis upon which we could conclude that the credit rating itself communicates any provably false connotation.  Even if we could draw any fact-based inferences from this rating, such inferences could not be proven false because of the inherently subjective nature of Moody's ratings calculation.

---

[11]   The nature of the ratings business has been the subject of opinions issued by federal courts around the country that have recognized that credit rating agencies such as S&P and Moody's are, at their core, financial publishers. *See, e.g., In re Scott Paper Co. Sec. Litig.*, 145 F.R.D. 366, 367, 369 (E.D. Pa. 1992) ("S&P rates and comments on the creditworthiness of public companies and their securities and disseminates that information to the public. . . . S&P maintains editorial control over the form and content of its publications and over the decision whether to publish any particular rating."); *In re Pan Am Corp.*, 161 B.R. 577, 579 (S.D.N.Y. 1993) ("S&P assesses, rates and comments on the creditworthiness of domestic and international corporate and governmental debt instruments.").

1  *Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir.
2  2007).

3       The court held that rating opinions could not provide the basis for a
4  cognizable claim premised on their asserted falsity.  *Id*.  Another appellate court
5  reached the same result with respect to Moody's allegedly false opinion about
6  creditworthiness, expressed in words ("negative outlook") rather than a letter rating.
7  *Jefferson Co. Sch. Dist.* v. *Moody's Investors Svcs., Inc*., 175 F.3d 848, 852, 855-56
8  (10th Cir. 1999) (holding that "a statement of opinion relating to matters of public
9  concern which does not contain a provably false factual connotation will receive
10  full constitutional protection" and that a rating agency's evaluation of
11  creditworthiness is a "protected expression of opinion") (citation and internal
12  quotation marks omitted).

13       Plaintiffs' allegations that the CRAs' ratings were "misleading" cannot be
14  squared with these cases which are rooted in the notion that there is no such thing
15  as a "false idea" or a "false opinion."  *See Gertz* v. *Robert Welch, Inc.*, 418 U.S.
16  323, 339-40, 94 S. Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("[T]here is no such
17  thing as a false idea.  However pernicious an opinion may seem, we depend for its
18  correction not on the conscience of judges and juries but on the competition of
19  other ideas.").  Based on the principles set out by the Sixth Circuit in *Compuware*
20  and the Tenth Circuit in *Jefferson County*, dismissal is also required here.[12]

21  _____

22  [12]      A state court in California, in an unreported decision, overruled a demurrer
   last April to a negligent misrepresentation claim against the CRAs, over
23   arguments, *inter alia*, that the claim was barred by the First Amendment.
   *California Public Employees' Retirement System* v. *Moody's Corp., et al.*,
24   No. 09-490241, 2010 WL 2286924  (Cal. Super. Ct. May 24, 2010)
   ("*CalPERS*").  With respect to the First Amendment, the Superior Court
25   recognized that "under typical circumstances, the First Amendment protects
   ratings agencies."  *CalPERS*, at *5 (citing *Abu Dhabi*, 651 F. Supp. 2d at
26   175-6).  The Superior Court declined to apply that protection because it
27   concluded that the ratings opinions at issue there concerning "structured
   investment vehicles" were not a matter of "public concern."  Whatever the
28   merits of that analysis as to public concern in that context, the Superior

1

### 2.     Plaintiffs Have Not Alleged Actual Malice

2          Another line of cases, also rooted in the First Amendment, provides an

3   additional basis for dismissal.  These rulings – which require that a plaintiff plead

4   and prove "actual malice" – focus less on the opinion nature of ratings and more on

5   the need to avoid chilling the speech of those who provide information on matters

6   of public concern, lest they refrain from doing so to avoid the dangers of prolonged

7   and potentially crippling litigation.

8          The actual malice standard, first enunciated by the Supreme Court in *New

9   York Times* v. *Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L.Ed.2d 686

10  (1964), supplies the "breathing-space" the First Amendment requires.  *Id*. at 272.

11  Under this standard, an allegedly false statement about a matter of public concern

12  cannot give rise to liability unless the statement is made "with knowledge that the

13  statement was false or with reckless disregard [for] whether or not it was true."

14  *Hustler Magazine* v. *Falwell*, 485 U.S. 46, 56, 108 S. Ct. 876, 882, 99 L.Ed.2d 41

15  (1988).  The actual malice standard limits liability for "either innocent or negligent

16  misstatement," and guards against the "grave hazard of discouraging the press from

17  exercising [its] constitutional guarantees."  *Time, Inc.* v. *Hill*, 385 U.S. 374, 389, 87

18  S. Ct. 534, 543, 17 L.Ed.2d 456 (1967).  Recklessness under the actual malice

19  standard "is not measured by whether a reasonably prudent man would have

20  Court's analysis in *CalPERS* in fact *supports* application of the First
21  Amendment here.  This *is* the "typical" case to which the *CalPERS* and *Abu*
    *Dhabi* opinions refer.  Here, there can be no serious dispute that: (i) the
22  CRAs' ratings of Fannie Mae and Freddie Mac — two large, well known
    GSEs whose securities are traded publicly — were matters of public concern;
23  and (ii) that those ratings were disseminated broadly.  *See* SAC ¶ 17
    (acknowledging that CRAs' ratings of Fannie Mae and Freddie Mac were
24  "published"); Biderman Decl., Ex. 1 and 2; Rubins Decl., Ex. 1 and 2.  *See*
    *also Jefferson County*, 175 F.3d at 563 n.3 ("Given the importance of
25  financial information to investors and the economy as a whole, bond rating
    constitutes a matter of 'public concern.'"); *In re Enron*, 511 F. Supp. 2d at
26  825.  Thus the decision in *CalPERS* does not serve as a bar to — and in fact
27  supports — the application of the First Amendment defenses available to the
    CRAs in this case.

28

1    published, or would have investigated before publishing." *St. Amant* v. *Thompson*,

2    390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).  Instead, the test is

3    whether "the defendant in fact entertained serious doubts as to the truth of his

4    publication." *Id.*; *see also Bose Corp.* v. *Consumer Union of United States, Inc.*,

5    466 U.S. 485, 511 n.30, 104 S. Ct. 1949, 1965 n.30, 80 L.Ed.2d 502 (1984) (stating

6    that there is no "actual malice" unless "the defendant realized that his statement was

7    false or [] *subjectively* entertained serious doubt as to the truth of his statement")

8    (emphasis added).

9          Courts have consistently and explicitly held that the actual malice

10   standard applies with full force to claims (like Plaintiffs') made against the CRAs

11   regarding their rating opinions.  For example, in *County of Orange*, the plaintiff,

12   Orange County, sued S&P for breach of contract and professional negligence,

13   arising out of allegedly "inaccurate" ratings of the County's debt.  The County

14   claimed that as a result of relying on S&P's ratings, it incurred large debts and was

15   forced to declare bankruptcy.  The court granted S&P's motion for summary

16   judgment in part, finding that the County's debt obligation was a matter of public

17   importance and holding that the claims were subject to the actual malice standard.

18   *County of Orange* v. *McGraw-Hill Cos.*, 245 B.R. 151, 157 (C.D. Cal. 1999)

19   ("Because the County alleges harm arising from S&P's expressive activity," *i.e.*, its

20   published credit ratings, "the County must . . . satisfy the heightened pleading

21   standards of the First Amendment.") (internal quotation marks omitted).

22         Similarly, in the *Enron* case, plaintiff's failure to plead actual malice

23   provided an independent basis for dismissal of plaintiff's claims against the rating

24   agencies.  *See Enron*, 511 F. Supp. 2d at 825 (dismissing claims because plaintiff

25   "ha[d] not alleged facts showing that the CRAs were at fault because they knew or

26   had significant suspicions that their statements were false and thus acted with actual

27   malice").  In reaching its determination, the court cited to, among other authorities,

28   the Supreme Court's decision in *Harte-Hanks Communications, Inc.* v.

1   *Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696, 105 L.Ed.2d 562 (1989),

2   which held that "failure to investigate before publishing, even when a reasonably

3   prudent person would have done so, is not sufficient to establish reckless

4   disregard." *See also Compuware Corp.*, 499 F.3d at 526-28.

5         Here, the CRAs' ratings on publicly issued debt issued by two large GSEs

6   are plainly matters of public concern and Plaintiffs can make no allegations that,

7   even on the most generous reading, could satisfy the actual malice test.  As noted,

8   the SAC alleges at most that S&P and Moody's were "aware that Fannie Mae and

9   Freddie Mac were in financial trouble and were bad risks" when they published

10  their ratings.  SAC ¶ 18.  This sort of conclusory allegation is wholly insufficient to

11  support a finding of actual malice in connection with the Fannie and Freddie

12  ratings.  *See Enron*, 511 F. Supp. 2d at 825 (finding insufficient the "conclusory

13  allegations regarding the CRAs" because such allegations do not "satisfy any of the

14  specific, enhanced pleading requirements established by courts to overcome First

15  Amendment protection").  Setting aside for a moment this fatal deficiency, even the

16  rote repetition of the correct legal standard, without more, would not be sufficient to

17  constitute actual malice.  *See Barger* v. *Playboy Enterprises, Inc*., 564 F. Supp.

18  1151, 1156 (N.D. Cal. 1983) (conclusory allegation that defendant acted

19  "recklessly" was insufficient to constitute an allegation of actual malice); *Shamley*

20  v. *ITT Corp*., 869 F.2d 167, 173 (2d Cir. 1989) (allegations of malice "must be

21  supported by sufficient evidentiary facts").  Plaintiffs' negligence and negligent

22  misrepresentation claims must therefore be dismissed as a matter of law.

23                          **IV.   CONCLUSION**

24         For the reasons set forth above, the CRAs' motion to dismiss should be

25  granted, and Plaintiffs' claims should be dismissed with prejudice.

26

27

28

1

2

DATED:  September 13, 2010

3

                                        /s/ David T. Biderman

4

                                        Floyd Abrams (admitted *pro hac vice*)
                                        Brian Markley (admitted *pro hac vice*)
5                                        CAHILL GORDON & REINDEL LLP
                                        80 Pine Street
6                                        New York, New York  10005
                                        Telephone: (212) 701-3000
7                                        Facsimile: (212) 269-5420

                                        David T. Biderman (SBN 101577)
8                                        Judith B. Gitterman (SBN 115661)
                                        PERKINS COIE LLP
9                                        1888 Century Park East, Suite 1700
                                        Los Angeles, CA  900671
10                                        Telephone: (310) 788-9900
                                        Facsimile: (310) 788-3399

11                                        *Attorneys for Standard & Poor's Financial
                                        Services, LLC*

12                                        /s/ Scott D. Cunningham(as authorized on
                                        September 13, 2010)
13

14                                        James J. Coster (admitted *pro hac vice*)
                                        James Regan (admitted *pro hac vice*)
15                                        Joshua M. Rubins (admitted *pro hac vice*)
                                        SATTERLEE STEPHENS BURKE & BURKE LLP
16                                        230 Park Avenue, 11th Floor
                                        New York, New York  10169
17                                        Telephone: (212) 818-9200
                                        Facsimile:  (212) 818-9606

18

19                                        Frank A. Silane (SBN 90940)
                                        Scott D. Cunningham (SBN 200413)
20                                        CONDON & FORSYTH LLP
                                        1901 Avenue of the Stars, suite 850
21                                        Los Angeles, CA  90067-6010
                                        Telephone: (310) 557-2030
22                                        Facsimile: (310) 557-1299

                                        *Attorneys for Defendant Moody's Investors
23                                        Service, Inc.*

24

25

26

27

28